**Lewis Roca Rothgerber Christie LLP**
201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

**Jared L. Sutton** (State Bar No. 028887)
Direct Dial: 602.262.0259
Email:  jsutton@lrrc.com

**Jennifer Lee-Cota** (State Bar No. 033190)
Direct Dial: 602.262.5368
Email:  jleecota@lrrc.com

*Attorneys for Plaintiff Best Western International, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Best Western International, Inc.,<br><br>  Plaintiff,<br><br>vs.<br><br>764 4th Avenue Associates, LLC, a foreign corporation,<br><br>  Defendant. | No.<br><br>**COMPLAINT** |

Plaintiff Best Western International, Inc. ("Best Western"), for its Complaint against Defendant 764 4th Avenue Associates, LLC ("Defendant" or "764") alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Best Western is a non-profit corporation organized under the laws of the State of Arizona with its headquarters located in Phoenix, Arizona.

2. Defendant is a New York limited liability company with its principal place of business in Queens, New York.  Defendant owns a hotel located at 764 4th Avenue, Brooklyn, New York, known as the Brooklyn Way Hotel the ("Hotel").

3. Upon information and belief, Joseph Yunatanov ("Yunatanov") is the President of 764 and sole member of 764.  On information and belief, Yunatanov is a citizen of New York.

4. Pursuant to the November 2, 2017, BW Signature Collection Distribution Agreement ("Distribution Agreement") between Best Western and Defendant,

1  Defendant agreed that the forum for any dispute arising under the Distribution
2  Agreement would be a state or federal court within the geographical boundaries of
3  Maricopa County, Arizona.
4      5.    This Court has jurisdiction over the claims and venue is proper pursuant to
5  28 U.S.C. §§ 1391 and 1332 because:  (1) Best Western is an Arizona non-profit
6  corporation with its principal place of business in Phoenix, and its witnesses are either
7  located in Phoenix or available in Phoenix; (2) Defendant is a citizen of New York; (3)
8  the amount in controversy exceeds $75,000.00; (4) there are no matters pending between
9  the parties in any other jurisdiction; and (5) Defendant executed a contract that contains
10 a forum-selection clause requiring any dispute to be resolved in Maricopa County,
11 Arizona, according to Arizona law.
12     6.    The exercise of personal jurisdiction over the Defendant by this Court is
13 proper pursuant to and because, among other reasons, the Defendant expressly agreed to
14 litigate any dispute with Best Western in Maricopa County, Arizona.

## GENERAL ALLEGATIONS

16     7.    Best Western is a hotel-industry service organization that operates on a
17 cooperative basis by and for its hotelier members, which are independent owners and
18 operators of Best Western® branded hotels.
19     8.    BW Signature Collection® is an exclusive soft brand offering provided to
20 independent hoteliers.  As part of the BW Signature Collection, properties are provided
21 access to Best Western's reservation system and various other services.
22     9.    The rights and obligations of BW Signature Collection properties are
23 governed by the BW Signature Collection's distribution agreement.  *See* Distribution
24 Agreement attached at Exhibit 1.
25     10.    On or around November 2, 2017, Yunatanov, as President of 764,
26 executed the Distribution Agreement for the Hotel.  (Ex. 1, at 1.)
27     11.    The Distribution Agreement was for an initial term of ten (10) years.
28 (*Id.* at ¶ 1(a).)

12. The Distribution Agreement provides that either party could cancel the Distribution Agreement for cause upon 30 days' notice and a fifteen (15) day cure period. (*Id.* ¶ 1(b).)

13. The Distribution Agreement provides that if Plaintiff Best Western cancels the Distribution Agreement for cause, Defendant is required to pay Best Western liquidated damages in an amount calculated by taking the average of the prior twelve (12) months fees owed to Best Western and multiplying that average by the lesser of: (i) twelve (12), or (ii) the remaining number of months in the Term. (*Id.* ¶ 1(c).)

14. The Distribution Agreement requires Defendant to pay fees and/or charges to Best Western as detailed in Exhibit A to the Distribution Agreement. (*Id.* ¶ 3(h).)

15. Exhibit A to the Distribution Agreement requires Defendant to pay monthly fees of five percent of the Hotel's Gross Rooms Revenue, which is defined as "booked revenue from the rental, sale, use, or occupancy of guest rooms at the Hotel for whatever purpose, including cash and credit transactions, whether or not collected by the Hotel, and any proceeds from business interruption insurance. Gross Rooms Revenue does not include taxes required by law, revenue from telephone services, movie rentals, vending machines, room service, parking or food and beverage sales." (*Id.* at Exhibit A.)

16. The Distribution Agreement provides that if Best Western does not receive payment within 45 days of the date of its invoices, the Hotel is subject to a late fee at a rate to be determined by Best Western, but not to exceed 18% per annum. (*Id.* ¶ 3(o).)

17. The Distribution Agreement requires Defendant to provide appropriate documentation (*e.g.*, monthly gross rooms revenue, occupancy tax records, etc.) to Best Western such that Best Western may calculate fees, charges and credits. (*Id.* ¶ 3(s).)

18. The Distribution Agreement defines "Hotel Information" as "rates, availability, taxes, fees, Hotel and room information, cancellation and no-show policies, etc." (*Id.* ¶ 2(b).)

19. The Distribution Agreement requires Defendant to use best efforts to provide Hotel Information to Best Western. (*Id.* ¶ 3(m).)

20. The Distribution Agreement requires Defendant to authorize Best Western to calculate relevant rates, taxes and fees based upon Hotel Information. (*Id*. ¶ 3(n).)

21. The Distribution Agreement requires Defendant to maintain the Hotel and provide amenities, as determined by Best Western from time to time, consistent with an upper-midscale hotel. (*Id*. ¶ 3(b).)

22. The Distribution Agreement requires Defendant to achieve a passing Best Western Quality Assurance Assessment rating prior to activation and during the duration of the Agreement. *Id*. at ¶ 3(e).

23. The Distribution Agreement requires Defendant to allow Best Western to assess the Hotel every twelve months for a Quality Assurance visit to ensure quality guest experiences and Hotel conditions. Failure of the assessment can result in additional Quality Assurance requirements, as well as termination of the Distribution Agreement for cause. (*Id*. ¶ 3(r).)

24. The Distribution Agreement requires Defendant to allow Best Western, at Best Western's cost, to annually or upon reasonable cause, audit Hotel records to validate Hotel revenue. In the event an audit reveals material inconsistencies, the Hotel shall reimburse Best Western for the cost of the audit. (*Id*. ¶ 3(t).)

25. At all relevant times, the Hotel had 99 guest rooms on eleven floors.

26. In 2018, Best Western learned that the Hotel might be using its rooms as a homeless shelter.

27. In October 2018, Best Western inquired with the general manager of the Hotel, Christian Aguayo, as to whether the Hotel was using any of its 99 rooms to house homeless individuals. The general manager indicated that the Hotel had a contract to provide housing for homeless individuals for approximately 18 of its 99 rooms, but that the contact was expiring soon and the Hotel would no longer offer such housing.

28. On February 7, 2019, Best Western performed a QA assessment and the Hotel passed. There were no obvious indications during the visit that the Hotel was housing homeless individuals. This was consistent with the 2018 representation by the

Hotel's general manager that the Hotel was going to discontinue its practice of offering housing for homeless individuals.

29. In January 2020, Best Western learned that 91 of the Hotel's 99 rooms were booked without any guest names given. With little or no inventory available, Best Western suspected this meant the Hotel was again providing housing for homeless individuals.

30. On January 30, 2020, Best Western sent a letter to Yunatanov, Defendant's President, inquiring whether the Hotel was being used to house homeless individuals or as some other form of public housing. In that letter, Best Western indicated any such use of the Hotel was inconsistent with the Distribution Agreement's requirement that the Defendant maintain the Hotel and provide amenities consistent with an upper-midscale hotel. Best Western also asked for proof that Defendant had liability insurance to cover potential liabilities associated with providing a homeless shelter and proof that Best Western was covered as an additional insured on all such policies. (Ex. 2.)

31. Neither Yunatanov nor anyone else representing Defendant responded to Best Western's January 30, 2020 letter.

32. On March 5, 2020, a Best Western representative visited the Hotel for a Quality Assurance visit and learned that ten of its eleven floors were being used as a homeless shelter for men. Best Western took photographs: (i) showing that guest furniture had been removed and replaced with bedding and other furniture for use as a shelter; (ii) showing signage welcoming residents of the "AAPCI Brooklyn Way Men's Shelter"; (iii) identifying meal times for AAPCI operations; (iv) describing adult shelter rules and responsibilities; and (v) identifying the schedules for social services personnel, including case managers and employment and housing specialists. In addition to the photographs, the Hotel's General Manager, Christian Aguayo, confirmed to a Best Western representative that the Hotel was being operated primarily as a homeless shelter.

33. On March 6, 2020, after confirming the previous day that the Hotel was being used as a shelter rather than a hotel, Best Western notified Defendant that it was in breach and material default of the Distribution Agreement by, among other things, not using the property as an upper midscale hotel.  Consistent with the Distribution Agreement, Best Western gave Defendant fifteen days to cure the default; notice that if not cured in that time, Best Western would be terminating the Distribution Agreement for cause in thirty days; and notice that if terminated, Defendant would be obligated to pay Best Western liquidated damages and other fees pursuant to Sections 1(b) and 1(c) of the Distribution Agreement and to cease using Best Western's trademarks.  (Ex. 3.)

34. On March 9, 2020, Nelli Zarystskiy responded to Best Western's March 6, 2020, stating:  "In reply to your Default and Cure Letter dated March 6, 2020, please understand that it was completely pure business decision based on today's economy. Should you have any questions or concerns please do not hesitate to contact us." Ms. Zarystskiy copied Yunatanov on the email.  (Ex. 4.)

35. At all relevant times, Defendant represented to Best Western and the public that it was operating a hotel, not a shelter/public housing, including by describing the Brooklyn Way as a hotel on its own website (www.bwplusprospectpark.com/en-us) as reflected below.



36. In April 2020, Best Western discovered that Defendant had been underpaying its Monthly Fees since December 2017, which are five percent of the Hotel's Gross Rooms Revenue. (Ex. 1 at Ex. A.)

37. Best Western's standard billing practice is to invoice a licensed hotel, including Defendant, based on the departure date of each reservation. In other words, because Best Western bills once a reservation is "consumed" (*i.e.* after check out), if there is no departure date for a given reservation, the revenue associated with that reservation will not be incorporated into the Monthly Fee.

38. In April 2020, Best Western learned that, as far back as 2017, Defendant had been deliberately failing to check-out "reservations" for rooms that were being used for Defendant's shelter operation.

39. Having not checked-out any of the multiple reservations for homeless/public housing stays, which by 2020 amounted to over 90% of the Hotel's capacity, Defendant failed to properly report its revenue to Best Western and thus failed to pay the Monthly Fees owed Best Western.

40. On information and belief, Defendant was and is being paid for the rooms it has dedicated for use in its shelter operation. Indeed, Ms. Zarystskiy, with a copy to Yunatanov, described this practice as a "pure business decision based on today's economy."

41. After discovering this, Best Western attempted numerous times to contact Yunatanov to discuss the underpayment, but he referred Best Western to the General Manager for the Hotel, Mr. Aguayo.

42. On May 15, 2020, Best Western sent a letter to Yunatanov demanding that Defendant pay the outstanding Monthly Fees. Best Western provided Yunatanov a detailed accounting outlining each reservation, arrival dates, anticipated departure dates, and the monthly fee amounts (five percent of Gross Rooms Revenue) Defendant owed through May 1, 2020. Best Western indicated in its letter that it would add these outstanding amounts to Defendant's next monthly statement for June 1, 2020. (Ex. 5.)

43. On June 1, 2020, Best Western added the outstanding amounts to Defendant's June 1, 2020 statement and sent the statement to Defendant. (Ex. 6.)

44. On or about June 17, 2020, Yunatanov contacted Best Western by phone and stated that Defendant would not pay the outstanding amounts. To date, Defendant has not paid the outstanding amounts owed.

45. On June 24, 2020, counsel for Defendant and Yunatanov wrote Best Western indicating that Defendant was treating Best Western's March 6, 2020 letter as formal notice of termination and that Defendant was treating the Distribution Agreement as having been terminated effective May 6, 2020.

46. As of the date of this complaint, Defendant has not paid Best Western for its outstanding Monthly Fees and has also indicated that it will not pay the liquidated damages it as a result of the termination for cause.

## **COUNT I – BREACH OF CONTRACT**

47. Best Western incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

48. The Distribution Agreement is a valid, binding and enforceable contract.

49. Best Western fully performed its obligations under the Distribution Agreement.

50. Defendant materially breached the Distribution Agreement by operating the Hotel as a homeless shelter/public housing and by failing to uphold the brand standards required by the Distribution Agreement.

51. Best Western had good cause to terminate the Distribution Agreement based on Defendant's material breach.

52. Defendant further materially breached the Distribution Agreement by failing to pay Best Western the amounts due and owing as required by the Distribution Agreement, including the Monthly Fees and liquidated damages for termination for cause.

111734223.5

8

53. Defendant's performance under the Distribution Agreement was not excused or relieved.

54. Pursuant to the express terms of the Distribution Agreement, interest has accrued and continues to accrue on the unpaid account balance at a rate no greater than 18% per annum.

55. As of June 1, 2020, there remains due and owing by Defendant to Best Western the sum of no less than $476,464.07, and that amount will increase because of the contractually-mandated interest. (Ex. 6.) This includes the outstanding Monthly Fees (five percent of Gross Rooms Revenue) through May 1, 2020. (Exs. 1 at Ex. A, 5 & 6.)

56. Defendant also owes Best Western liquidated damages in an amount equal to twelve-times the average of the prior twelve months fees owed. (Ex. 1 ¶ 1(c).)

## COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

57. Best Western incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

58. The Distribution Agreement is a valid, binding, and enforceable contract.

59. The Distribution Agreement contains an implied covenant of good faith and fair dealing.

60. Defendant's conduct, as described above, constitutes a breach of the covenant of good faith and fair dealing.

61. In particular, Defendant's knowing failure to check-out reservations to avoid paying a monthly fee, and surreptitiously operating a homeless shelter/public housing at the Hotel, unfairly and unreasonably deprived Best Western of the benefit of its bargain under the Distribution Agreement.

62. As a direct and proximate result of Defendant's violation of the implied covenant, Best Western has suffered damages in an amount to be proven at trial.

## COUNT III – UNJUST ENRICHMENT

63. Best Western incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

64. On information and belief, Defendant has been paid for the rooms it has dedicated for use in its shelter operation and therefore Defendant has been enriched.

65. Even though Defendant has received funds for the rooms it has used for its shelter/public housing operation, Defendant has failed to pay any funds owed to Best Western for the use of Best Western's intellectual property and reservation system, resulting in Best Western's impoverishment.

66. A connection exists between the enrichment and impoverishment because the Hotel earned revenue based on services provided by Best Western without compensating Best Western for those services.

67. Defendant has no justification for using Best Western's services to generate revenue for the Hotel without paying Best Western for those services.

68. Best Western has been damaged in an amount to be determined at trial.

## COUNT IV – NEGLIGENT MISREPRESENTATION

69. Best Western incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

70. Under the Distribution Agreement, Defendant was required to pay Best Western Monthly Fees of five percent of the Hotel's Gross Rooms Revenue.

71. Defendant knew Best Western's standard billing practice was to invoice the Hotel based on reservations for which the Hotel reported a departure date.

72. Defendant also knew Best Western would rely on the Hotel to provide accurate reservation information, including departure dates, and to provide accurate reporting of the Hotel's revenue.

73. Defendant knew that the Monthly Fees charged by Best Western in the invoices that Best Western sent and that Defendant received starting December 2017 did

not include the Hotel's revenue for reservations/stays used for the Hotel's shelter/public housing.

74. Best Western's reliance on the Hotel to provide accurate reservation information, including departure dates, and to accurately report its revenue, is reasonable because the Hotel is responsible for managing its reservations, it has the best access to information regarding arrivals and departures and its revenue, and it agreed to compensate Best Western at a rate of five percent of Gross Rooms Revenue, which the parties agreed covered revenue "from the rental, sale, use, or occupancy of guest rooms at the Hotel for whatever purpose."

75. Defendant failed to exercise reasonable care in its communications with Best Western related to its revenue and reservations because it negligently or intentionally failed to check out any reservations used for Defendant's shelter/public housing operation such that none of those reservations were showing as having departed and ready for billing by Best Western as part of the Hotel's Monthly Fees.

76. By negligently or intentionally failing to check out any reservations used for Defendant's shelter/public housing operation such that none of those reservations were showing as having departed and ready for billing by Best Western as part of the Hotel's Monthly Fees, Defendant negligently or intentionally underreported the revenue earned by the Hotel, which caused Best Western to generate invoices that did not accurately reflect the Hotel's Monthly Fees owed to Best Western.

77. Through this omission, Defendant has deprived Best Western of money it is owed under the Distribution Agreement. Best Western has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

THEREFORE, Best Western International, Inc. seeks judgment against Defendant as follows:

A. An award to Best Western of its damages in an amount to be proven at trial;

B. Attorneys' fees and costs pursuant to the Distribution Agreement, A.R.S. §§ 12-341,12-341.01, or any other applicable law;

C. Pre- and post-judgment interest; and

D. Any other relief the Court deems just and proper.

DATED this 8th day of September, 2020.

                        LEWIS ROCA ROTHGERBER CHRISTIE LLP

                        By:  *s/Jennifer Lee-Cota*
                            Jared Sutton
                            Jennifer Lee-Cota
                            *Attorneys for Plaintiff*

111734223.5

12